U. P. Rly. Co. v. Estes.

THE UNION PACIFIC RAILWAY COMPANY v. WILLIAM H. ESTES.

1. SOLICITING EMPLOYMENT — *Assertion of Competency.* Ordinarily, when an adult person solicits employment in a particular line of work, the act of solicitation is an assertion by the person seeking employment that he is competent to discharge all its ordinary duties; and it is one of the general, implied conditions of every contract for service with an adult person, that the servant is competent to discharge the duties for which he is employed. It is the fault of the servant if he undertakes without sufficient skill, or applies less than the occasion requires.

2. DANGEROUS DUTY — *Injury — No Recovery, When.* If, in the discharge of a dangerous duty, an employé of a railroad company voluntarily places himself in a dangerous position, unnecessarily, when there is another place that is safer that he could have chosen, and he has time to exercise his judgment, and injury occurs to him by reason of his choice, he cannot recover for such injury.

3. ORDINARY CARE, *Want of; Instance Given.* There is a want of ordinary care in the voluntary attempt of an employé of a railroad company, discharging the duties of a helper to a hostler, to get upon a switch engine in motion by the step at the rear right-hand side of the cab of the engine, when he had no duty to perform in the cab of the engine, and when a safer place for him to get upon the engine would be the rear foot-board, which was used for this purpose by that class to which he belonged; and when the danger of the attempt to get upon the side step is increased by the step being obscured to some extent by the escaping of steam from the cylinder-cocks of the engine, and the dust blown up thereby.

4. EMPLOYÉ — *Personal Injury — No Recovery in Case Stated.* If the rear right-hand step on the cab of a switch engine is defective, and a person employed by the railroad company is discharging the duties of a helper to a hostler in charge of the engine, attempts to get upon such step when the engine is in motion, and when the step is partially obscured by escaping steam, and dust blown up thereby; when he had no duty to perform that required him to get on at such a place, and when the rear foot-board was a safer place to get upon the engine in motion; when he deliberately chose to get upon the side step without any directions so to do; when he had adopted the plan of getting on, and riding on the side; when he was afraid to attempt to get upon the front foot-board, because the engine was going too fast, and in his attempt to get upon the side step his foot slipped off, rested on

the rail, and one of the wheels of the engine so mashed and mangled it as to compel amputation of all that part of the foot in front of the ankle-joint, he cannot recover for such injury on account of the defective condition of the step.

*Error from Wyandotte District Court.*

THIS case was tried by a jury, at the December Term, 1886, of the district court of Wyandotte county. The material facts are stated in the opinion and in the special findings of the jury. The plaintiff asked the court to instruct the jury as follows:

"1. It was the duty of the defendant company to provide and furnish its employés, among whom was this plaintiff, with a suitable and safe road, engines, cars, and appliances for conducting the business, and to select competent and reliable servants to use and operate the same; and the defendant is liable for injury occurring to an employé in the operation of said railroad caused by defective machinery or appliances upon any of its engines or cars, when such defects could have been discovered and remedied by the exercise of reasonable and ordinary care and diligence upon the part of defendant.

"2. It was the duty of the plaintiff in the discharge of his duties to exercise reasonable and ordinary care to avoid injury, and a failure upon the part of the plaintiff to exercise such care would bar the right of recovery; and the jury in arriving at their determination as to what constitutes such reasonable and ordinary care may take into consideration the age and experience, or want of experience, of the plaintiff, the kind of labor he was performing, the orders he was under, if any, and any and all other facts and circumstances surrounding plaintiff at the time of the accident.

"3. If the jury believe from the evidence that there was any defect in the engine of the defendant, or appliances thereof, either in construction or from injury received thereto, and that such defect had existed for a considerable time prior to the accident, and that such defect could have been discovered by ordinary care and diligence, then no actual notice of such defects upon the part of defendant is necessary to charge defendant with liability for injury caused by such defect.

"4. It is not necessary for the plaintiff, in the first instance, to prove that he was not guilty of negligence contributing to the injury, and the defendant company is not excused by any

negligence of the plaintiff which does not amount to a want of ordinary care on the part of the plaintiff in avoiding the consequences of the defendant's negligence."

The court gave the foregoing instructions to the jury, and the defendant duly excepted.

The defendant requested the court to give the following instructions to the jury. Instructions 5, 6, 8, 9, 10 and 11 are in the opinion:

"12. If foot-boards were provided on the engine to enable those who did the switching to get upon the engine, and to ride upon, and plaintiff knew what the foot-boards were provided for, and those foot-boards were in good condition and could have safely been used, the plaintiff cannot complain even if the jury shall find that the step upon which plaintiff was injured was defective.

"13. Even if the jury shall find that the step upon which plaintiff alleges he was injured was out of order, the defendant was not at fault on that account unless the plaintiff proves that it (the defendant), or its foreman or agent who had charge of the locomotive, knew that the step was out of order, or that it had been out of order so long that the defendant, or its agent in charge of such engine, ought, by the exercise of reasonable diligence, to have known that the step was out of order; nor then if the jury find that the foot-boards were there for him to ride upon, and that he could have got upon the rear foot-boards without exposing himself to danger."

"15. If the step of which plaintiff complains was adjusted so as to be convenient for and in the position desired by the engineer who ran the engine, and the plaintiff had no duty to perform upon the cab of the engine while in motion that required him to use said step, he cannot complain of the position or adjustment of said step, nor recover for any injury he may have received because of the adjustment of said step."

"17. The defendant is not required to have any particular kind of a step on its locomotive, (but must provide a reasonable step.) [Words in parenthesis being added by the court.] *"And it is no ground for recovery in this action if you find that the kind of step complained of in this action was not as safe a kind as others in use upon locomotives."* [Words in italics being stricken out by the court. Given as modified, and excepted to by plaintiff and defendant.]

"18. In every contract of hiring there is an implied con-

tract that the servant is competent and fit to discharge the duties of the service for which he is employed, and that he will faithfully, honestly, and properly discharge those duties. [Given.]

" 19. In taking service as a helper to the hostler, the plaintiff assumed the risk of ordinary danger incident to the position he occupied, and if the duties of the position required him to get upon the engine in motion, he assumed the risk of the ordinary dangers attending the getting on engines in motion. [Given.]

" 20. If the plaintiff's duties required him to get upon engines in motion, in doing so he was required and bound to use such care as was commensurate with that practice, and if he was negligent at the time of his injury in attempting to get upon the engine in motion, (and such negligence materially contributed to the accident,) he cannot recover in this action. [Words in parenthesis being added by the court. Given as modified, and excepted to by plaintiff and defendant.]

" 21. In getting upon the engine in motion the plaintiff was bound to use his eyes and look and see where he was to step, and if he did not look, and was injured by reason of any defect in the step, (which he might have discovered by looking,) he cannot recover for any injuries he received on account of any such defect." [Given as modified, and excepted to by plaintiff and defendant.]

" 23. If the jury believe from the evidence that the defendant company had placed upon the front end of the locomotive in question, and upon the rear end of the tender, foot-boards and hand-rails running clear across the same, upon which foot-boards the helper and switchmen were to ride while the engine was in motion, and that the plaintiff could get upon one or the other of said foot-boards without exposing himself to any danger, and that the plaintiff had ridden upon such foot-boards on this or any other engine, and knew the object and purpose of such foot-boards, it was his duty to have used them, and not risked the hazard incurred by attempting to get upon the step of the cab of the locomotive. (If it was dangerous to do so.) [Words in parenthesis being added by the court. Given as modified, and excepted to by plaintiff and defendant.]

" 24. If the jury believe from the evidence that the locomotive was in motion when the plaintiff attempted to get upon it by the step in question, (and that it was dangerous to make such attempt,) and that he could have safely got upon it if he

had waited for the rear foot-board, it was his fault in attempting to get upon the locomotive by the step; it was his duty to have waited till the rear foot-board came to him." [ Words in parenthesis being added by the court. Given as modified, and excepted to by both plaintiff and defendant.]

The court instructed the jury as follows:

"1. The burden is on the plaintiff to establish his right to recover damages from the defendant in this action by a preponderance of the evidence.

"2. By a preponderance of the evidence is not necessarily meant the greatest number of witnesses, but that evidence which, after a consideration of the entire evidence, is, in the judgment of the jurors, entitled to the greatest weight.

"3. The jury are the sole and exclusive judges of the weight of the evidence and the credibility of the witnesses; if the jury believe that any witness has willfully and corruptly testified falsely concerning any material fact, they may disregard the whole or any portion of the evidence of such witness. There is no inflexible rule requiring the jury to believe or disbelieve the whole or any particular portion of the evidence of any witness.

"4. In considering the evidence the jury can consider the manner of each witness while testifying herein; the apparent candor or want of candor, as the case may be, of each witness; his apparent bias and prejudice, if any, or freedom from bias or prejudice, as the case may be; the intelligence of the witness, his apparent recollection and means of information concerning the matters about which he testifies, and all other matters which will assist the jury in arriving at a correct conclusion concerning any disputed point in the evidence.

"5. An employé of a railroad company by virtue of his employment assumes all the ordinary and usual risks and hazards incident to his employment.

"6. As between a railroad company and its employés, the railroad company is required to exercise reasonable and ordinary care and diligence, and only such, in furnishing to its employés reasonably safe machinery and instrumentalities for the operation of its railroad.

"7. It will be presumed, in the absence of anything to the contrary, that the railroad company performs its duties in such cases, and the burden of proving otherwise will rest upon the party asserting that the railroad company had not performed its duty.

"8. And where an employé seeks to recover damages for injuries resulting from insufficiency of any of the machinery or instrumentalities furnished by the railroad company, it will not only devolve upon such employé to prove such insufficiency, but it will also devolve upon him to show either that the railroad company had notice of the defects, imperfections and insufficiencies complained of, or that by the exercise of reasonable and ordinary care and diligence it might have obtained such notice.

"9. By reasonable and ordinary care and diligence is meant that degree of care which an ordinarily careful and prudent man would be expected to use under similar circumstances.

"10. If you find for the plaintiff, the form of your verdict will be: 'We, the jury, find for the plaintiff, and assess his damages at $ ——.' If you find for the defendant, the form of your verdict will be: 'We, the jury, find for the defendant.' Reduce your verdict to writing; sign it by your foreman."

Interrogatories were submitted on behalf of plaintiff, as follows:

"*Ques. 1:* What is the extent of the injury received by plaintiff, Estes? *Ans.:* Loss of the entire front part of the foot.

"Q. 2. Is said injury permanent? A. Yes.

"Q. 3. Did plaintiff suffer great bodily pain and mental anguish as the result of said injury? A. Yes.

"Q. 4. How many months was plaintiff confined to his bed by reason of the injuries received? A. About nine months.

"Q. 5. Has he been able at any time to follow any kind of business, and if yes, to what extent, since receiving the alleged injury. If not, why not? A. Yes, a part of the time; from three to four months altogether since the wound was healed.

"Q. 6. When the plaintiff is walking is it not a fact that the ball of the heel of the injured foot slips back so that the weight of his body rests upon the scar of the wound and causes the plaintiff great bodily pain? A. Yes.

"Q. 7. If there were hand-holds upon the rear end of the cab and front end of the tender, did not the plaintiff catch such hand-holds when he attempted to get upon the engine? A. Yes.

"Q. 8. Was the rod supporting the step bent, and if so did the bending of the iron rod of the step increase or diminish

the danger in getting on or off the engine? A. Yes, it was bent, and the danger was increased.

"Q. 9. Was it the custom for persons employed in the business plaintiff was, to get on and off the engine while in motion at the place where plaintiff attempted to get on?

(Said question 9 was refused by the court.) ·

"Q. 10. Was the plaintiff at any time instructed not to get on or off engine while in motion? A. No.

"Q. 11. Was not plaintiff compelled to get on the side step of engines, to wit, the front step on tender and step on rear of cab, when discharging the duties of his employment in handling engines? A. Yes, frequently.

"Q. 12. Where could plaintiff ride on road engines, if he did not ride on side step or side steps, or on the cab?

(Refused.)

"Q. 13. Did anybody in authority command plaintiff not to get upon the cab of engine, and if yes, who was it? A. No.

"Q. 14. Was the kind of business plaintiff was engaged in and required to do dangerous? A. Yes.

"Q. 15. Was not plaintiff inexperienced in the kind of business he was required to perform? A. Yes.

"Q. 16. Did anybody in authority explain to plaintiff the dangerous character of the business he was required to do and the place or places on engines he was required to ride? A. No.

"Q. 17. Was plaintiff required to ride in any particular place on engines, or forbidden to ride in any place, and if yes, who gave him orders? A. No.

"Q. 18. Was not plaintiff required in the discharge of his duties to get on and off engines while in motion? A. Yes."

Interrogatories were submitted on behalf of the defendant, as follows:

"*Ques. 1:* Was not plaintiff employed as a helper to M. G. Kemp, a hostler of the defendant in its yards at Armstrong, at the time of his injury, and had he not been so employed for seven or eight days prior to his injury? *Ans.:* Yes. Plaintiff was employed by Mr. Parr, and directed by him to assist Mr. Kemp, who was to instruct him as to his duties.

"Q. 2. Were not the duties of Mr. Kemp as such hostler to run engines to and from the round-house, and from one place to another in the yard, wherever they might be wanted by the engineers in charge of such engines? A. Yes.

"Q. 3. Was it not the duty of plaintiff, as helper to said hostler, to open and shut switches for said hostler to enable him to run the engines from one place to another in the yard of defendant at Armstrong? A. Yes.

"Q. 4. While the hostler was running engines in the yard had the plaintiff any duty to perform upon said engines, or any occasion to be upon them except to ride from one place to another where it was necessary for him to throw switches to enable the hostler to pass with the engines? If you say the plaintiff had any duties to perform on the engines while they were in motion, being run by the hostler, say what such duty was? A. No, he had no duty to perform, except to ride from place to place, while the engine was in motion.

"Q. 5. At the time plaintiff was injured did he not throw a switch in front of the engine, and signal the hostler, Kemp, to move ahead over the switch, and did not the said hostler in obedience to such signal, move the engine forward over such switch? A. Yes.

"Q. 6. After plaintiff gave the signal, and the engine started forward, did he not remain at the switch until the engine came forward to where he was standing, and did he not stand there until the step of the engine, between the engine and tender, was opposite to him? A. Yes.

"Q. 7. When the engine step, between the engine and the tender, was opposite to him, did he not attempt to get upon the engine, between the engine and tender, while the engine was moving forward? A. Yes. When opposite him he stepped upon the step of the engine.

"Q. 8. Was not the engine provided with a step at the rear of the cab, and another at the front end of the side of the tender? A. Yes.

"Q. 9. Was there not a hand-hold on the rear corner of the cab, and one on the front corner of the tender? A. Yes.

"Q. 10. Were not the steps and hand-holds solely for the use of the employés of defendant who had duties to perform on the engine, in getting in and out of the cab of the engine? If they were for any other purpose, state what the purpose was. A. Yes.

"Q. 11. In attempting to get upon the engine at the time he was injured, did not the plaintiff take hold the hand-hold of the cab with his right hand, and the hand-hold of the tender with his left hand, and step up toward one of the steps with his left foot first. A. Yes; and placed his left foot on the

step of the engine, which slipped, causing the injury to plaintiff.

"Q. 12. Which step did the plaintiff try to step upon at the time he was injured — the step on the cab, or the step on the tender? A. Cab, or engine.

"Q. 13. Was not plaintiff on the right-hand side of the engine when he attempted to get upon it? A. Yes.

"Q. 14. Could plaintiff see the step which he tried to get upon at the time that he tried to get upon it; and if he could not, why could he not see it? A. Yes; but not plainly, on account of the escapement of steam, and the dust blown up thereby.

"Q. 15. Was not the step at the rear of the cab on the right side of the engine in question a flat, cast-iron plate, seven inches in diameter, with an iron rod let down from the cab running through a hole in the back of the step; and was not the step fastened to the rod by a set-screw, so that the step could be moved up and down and from side to side on the rod, and adjusted in the position desired by the engineer of the engine? A. No.

"Q. 16. If the step on the rear of the right-hand side of the cab of the engine was not of the kind described in question 15, the jury will describe said step in answer to this question, and say whether it was adjustable on the rod that supported it. A. It was an adjustable scoop-shovel step, with a set-screw.

"Q. 17. Was not the step complained of twenty-eight inches or more above the ground? If not, the jury will say what distance it was. A. It was twenty-eight inches above the rail.

"Q. 18. Was not the step on the front end of the side of the tender about eleven inches long and six inches deep, and supported by a band or stirrup at each end, hanging from the bottom of the tender, and running under and holding the step; and was not this step twenty-four inches above the ground? A. Yes.

"Q. 19. Was not the step on the rear of the engine and the one on the front of the tender about two feet apart? If not, how far apart were they? A. Yes.

"Q. 20. Were not the hand-holds on the engine and tender about two feet apart; if not, about how far apart were they? A. Yes; about that distance.

"Q. 21. On the front end of the engine in question and on the rear end of the tender at the time of the injury, were there not foot-boards from eight inches to twelve inches wide extending across the entire ends of the engine and tender, being

about six to eight inches above the rail; and if such foot-boards were not as above described, the jury will describe them? A. Yes.

"Q. 22. Was there not a hand-rail on the front end of the engine and the rear of the tender at the time plaintiff was injured? A. Yes.

"Q. 23. What were those foot-boards and hand-rails for? A. For employés to use in riding.

"Q. 24. How far was it from the cylinder-cocks on said engine to the place where plaintiff attempted to get on? A. About twenty feet.

"Q. 25. Was not the foot-board on the rear end of the tender the safest place for the plaintiff to get upon the engine when in motion, at the time he was injured? A. Yes.

"Q. 26. In getting on this locomotive between the engine and the tender on the right-hand side, was not the proper way to get on the step with the left foot first on the tank step, and then with the right upon the engine step? A. No; not necessarily.

"Q. 27. Was not plaintiff's left foot the one that was injured? A. Yes.

"Q. 28. Did the plaintiff as a helper to the hostler at the time he was injured have a duty to perform that made it necessary for him to get upon the engine in motion, between the engine and tender; if so, state what that duty was? A. No; except that he was directed to climb on by the hostler.

"Q. 29. At the time of the injury to plaintiff, was not the step complained of adjusted as the regular engineer who ran the engine wanted it for his convenience in getting on and off the engine? A. Yes.

"Q. 30. Was not J. D. Kirkpatrick the regular engineer who had charge of and ran this engine when plaintiff was injured? A. Yes; he was the regular engineer, but hostler Kemp had charge of the engine at the time of the injury.

"Q. 31. Did he have any difficulty in using said step in getting on and off this engine while he was in charge of it, by reason of the adjustment of the step? A. No.

"Q. 32. [Withdrawn.]

"Q. 33. As the engine was passing Estes after he threw the switch, did the hostler, Kemp, cause steam to be emitted from the cylinder cocks of said engine against and upon the plaintiff? A. Yes.

"Q. 34. If you answer the last question in the affirmative,

did such steam interfere with plaintiff's view of the step which he was trying to use? A. Yes.

"Q. 35. [Withdrawn.]

"Q. 36. Were the foot-boards and hand-rails on the front end of the engine and rear of the tender, on the engine in question, in such a position that a party could get upon said foot-board without getting between the rails? A. Yes.

"Q. 37. Was not the step upon which plaintiff was injured, for the sole purpose of getting on and off the engine when it was stationary? A. Not exclusively."

The jury found for the plaintiff, and assessed his damages at $5,000. Thereupon the defendant moved the court to render judgment in its favor on the special questions, and answers of the jury thereto, notwithstanding the general verdict; and the defendant also filed its motion for a new trial. The court overruled both motions, and rendered judgment on the verdict for the plaintiff. *The Railway Company* has brought the case here.

*J. P. Usher*, *A. L. Williams*, and *Chas. Monroe*, for plaintiff in error.

*John A. Hale*, and *J. O. Fife*, for defendant in error.

Opinion by SIMPSON, C.: On the 1st day of August, 1883, William H. Estes, aged twenty years, at his solicitation was employed by S. W. Parr, foreman of the round-house of the shops of the Union Pacific Railway Company at Armstrong, Wyandotte county, to work for the company. Before this time, Estes had worked for a short time for the company in the boiler shops. Before his employment by the plaintiff in error he had worked for about three months in the yards of the Chicago & Alton Railroad Company as a helper to a hostler. He was assigned to the night watch, commencing at six o'clock each evening, and his duties were to wipe engines, throw switches, and draw the fires from the ash-pans. The first three nights of his employment he was engaged in the house, wiping engines, and on the evening of the fourth he was ordered to the yards as a helper to a hostler. The

duty of the hostler is to take engines from the engineers, and run them to the round-house, or from one place to another in the yards, wherever they may be wanted by the engineer in charge. It was the duty of Estes, as a helper, to open and shut switches for the hostler. Estes worked as a helper during the succeeding nights, until a few minutes after six o'clock on the evening of the 11th day of August, when, in his attempt to step on an engine then in motion, his foot slipped off, rested on the rail, and a wheel of the engine cut it off in front of the ankle-joint, leaving the heel intact. The jury, in response to special interrogatories submitted by both parties, found this state of facts: First, as to the engine: It was provided with a step at the rear of the cab, and another at the front end of the side of the tender, and hand-holds on the rear corner of the cab and front corner of the tender, and these steps and hand-holds were for the sole use of the employés of the railroad company, who had duties to perform on the engine, in getting in and out of the cab of the engine, and they were about two feet apart. It was at the step in the rear right-hand side (the engineer's side) of the cab, or engine, that the injury occurred. This step is called in the evidence, findings, and instructions, the "side step." It was an adjustable scoop-shovel step, with a set-screw, and was about twenty-eight inches above the rail, and was adjusted to suit the convenience of the regular engineer in getting on or off the engine. On the front end of the engine, and on the rear end of the tender, there were foot-boards from eight to twelve inches wide, extending across the entire length of the engine and tender, and being from six to eight inches above the rails. There were hand-rails on the front end of the engine and the rear end of the tender, and these foot-boards and hand-rails were for the use of employés in riding. The foot-board at the rear end of the tender was the safest place for Estes to get upon the engine when in motion. The foot-boards and hand-rails on the front end of the engine and the rear end of the tender were in such a position that a person could get upon said foot-boards with-

out getting between the rails. The rod supporting the side steps was bent, and the danger increased thereby.

Second, as to the injury: Estes threw a switch in front of the engine, and signaled the hostler to move ahead over the switch; as the engine came forward he was standing near the switch, and waited until the step of the engine between the cab and the tender was opposite to him, when he stepped upon it, his foot slipped and the injury occurred. As the engine came opposite to him the hostler caused steam to be emitted from the cylinder-cocks against and upon Estes, and this interfered with his view of the steps; the cylinder-cocks were about twenty feet from the steps; he could see the steps, but not plainly, on account of the escapement of the steam and the dust blown up thereby.

These are the facts as found by the jury, but there are other statements bearing on both propositions that will be referred to in the opinion.

There are numerous legal questions arising on this state of facts, and they have been presented both to the court below and to this court in many different ways. In fact, all legal methods have been exhausted by the plaintiff in error in the preparation of this case for review here. There was a demurrer to the original petition, that it did not state facts sufficient to constitute a cause of action. At the trial there was a demurrer to the evidence of Estes, on the ground that it did not state facts to entitle him to recover. There was a motion for judgment in favor of the railroad company on the special findings. There was a motion for a new trial, on the ground that the verdict was not sustained by sufficient evidence, and because it was contrary to law. There were exceptions to the rulings of the court on the admission and rejection of evidence. There were numerous exceptions to the giving of certain instructions. With the record in this condition, giving this court an opportunity to review every step in the proceedings, and every incident of the trial, we have carefully considered the evidence, examined the findings, reviewed the instructions,

and, in a word, given the whole case a thorough and conscientious consideration.

The theory upon which the defendant in error tried the case was this: Estes was young, and inexperienced in the discharge of a dangerous duty assigned him; that he was told by the hostler to climb on the engine while in motion; that he attempted to obey orders by getting on at the side step; that the rod supporting the step was bent, and the adjustment of the step was such that it was unsafe, by reason of being pushed back under the tank; and that by reason of this condition of the step the injury was inflicted. The negligence of the railroad company in not providing a safe and proper step at the rear right-hand side of the cab fixes its liability.

The plaintiff in error tried the case on this theory: Estes having solicited employment in the round-house, this was an assertion on his part that he was competent to perform all ordinary round-house duties; that in getting on or off an engine in motion he must choose the safest place; that the side step at the rear end of the cab was a standard step used on engines of that make; that it was for the sole use and convenience of employés who had duties to discharge in the cab of the engine; that Estes as a helper to a hostler had no such duty to perform as to require him to use that step; that he attempted to use it when it was so obscured by escaping steam and blowing dust that it could not be seen ; that it was the duty of Estes to choose the safest manner to discharge a dangerous duty, and that his injury was occasioned by his want of ordinary care.

The trial court charged the jury as follows:

"*Fifth:* If the plaintiff had no duty to perform on the engine, and the foot-boards of the engine were provided for him to ride upon, and the rear foot-board was a safer place for him to get upon the engine, and safer place to ride than the side steps, then it was his duty to get upon the rear foot-board, and if he chose to get upon and ride upon the side steps of the engine he cannot recover because of any defect in said step.

"*Sixth:* If the side step of the engine that plaintiff claims

was defective was not there for his use, and he had no duty to perform at the time he was injured, that required or made it necessary for him to use it, he cannot recover in this case even though said step was defective."

"*Eighth:* It was not the duty of the plaintiff and he had no right to get upon the engine when in motion at the time he was injured, if for any reason he saw that there was any greater danger than usual in the performance of the duties assigned to him.

"*Ninth:* The duty of the plaintiff to open and close switches did not require him to get upon the engine in motion if the engine was going too fast to enable him to do so with safety."

"*Eleventh:* If the plaintiff had no duty to perform on the cab of the engine when he was injured, and if he was required to get upon it while in motion in order to ride back and forth in the performance of his duties as helper, it was his duty to get upon it in the safest place, and if he voluntarily got upon it or attempted to get upon it in a dangerous place, he cannot recover in this action."

I. The first question that we shall discuss is, the competency of Estes to do the work assigned to him. Counsel for defendant in error contend that by reason of his youth and inexperience, and the neglect of his superior to instruct him in his particular line of duty, his case is brought within the rule that "An employer who places a young and inexperienced person at work in an exposed, dangerous situation, is bound to give him due caution, and if he fails to do so, the mere fact that the servant had means by use of eyesight to see peril, will not alone charge the latter with contributive negligence." This rule has no application to the facts in this case, for several reasons. In the first place, it is one of the implied conditions of every contract for service that the servant is competent to discharge the duties for which he is employed, and that he possesses the requisite skill. (Wood Mas. & S. [2d ed.] 166; 2 Parsons on Contracts, § 54; Bishop on Contracts, enlarged edition, § 246, and citation in foot-note 4; 20 Pa. St. 130.) It is his own fault if he undertakes without sufficient skill or applies less than the occasion requires. (2 Kent's Com., 458; Story on Bailment, 281; Jones on Bailments, 91.) Ordinarily, when an adult person solicits employment from another in a

particular line of work, the act of solicitation is an assertion on the part of the person seeking employment that he is competent to discharge all its ordinary duties.

It must be held in this case, as a matter of law, that when Estes solicited employment in the round-house, he asserted his competency to discharge all the ordinary duties of workmen therein engaged, and that this was one of the implied conditions of his employment.

The jury, in answer to the fifteenth special interrogatory submitted by the defendant in error, say that Estes was inexperienced in the business he was required to perform.

The defendant in error, in his cross-examination, stated that before his employment in the round-house he had worked a "little" for the railway company in the boiler shops. He also stated that he had worked as a helper to a hostler in the Chicago & Alton railroad shops for about three months.

The fair implication from the evidence is, that while he was working in the boiler shops he made an application to Parr, foreman of the round-house, for a situation, and that this was prompted by his former experience in the Chicago & Alton yards. The duty required of him as defined by the evidence, while dangerous, was not difficult or complex. A few days' experience would be sufficient for an ordinarily intelligent performance of all its requirements. He had been discharging that duty for seven days without accident before the injury complained of occurred, in the immediate presence of his superiors, and it is a fair inference from this fact alone that his experience or aptitude was such as to render his services satisfactory. In addition to this, Estes stated on his cross-examination "that he wanted to get on the side step of the engine; that he had always adopted the plan of riding at the side," and said this in immediate connection with a statement that as the engine approached him he thought it unsafe to attempt to get upon the front foot-board. Now he had come to the conclusion, after thought and experience, that he would always get on the side of the engine. He had deliberately adopted a plan of riding on the side, and hence on this occasion, notwith-

standing the fact that he considered it unsafe to attempt to get on the front foot-board, he followed his previous line of thought, and tried to get on the side. This shows most conclusively that out of his experience had grown a determination on his part as to how he would perform a dangerous duty, that of getting on the engine while it was in motion. This fact and all the other facts recited above, repel the assumption of counsel for defendant in error that he comes within the rule first quoted. As a matter of fact apparent from the evidence, it must be held that he was competent to perform the work required of him by reason of his experience in that line, and hence it follows that the trial court erred in the second instruction given the jury where the following language is used: "That in arriving at a determination as to whether or not Estes exercised reasonable and ordinary care to avoid the injury, they might take into consideration his age, experience, or want of experience;" while in the eighteenth instruction they are told "that when Estes took service with the railway company there was an implied contract that he was competent to discharge the duties for which he was employed." The first is contradictory and misleading, and the second, under all the facts, is the law of the case.

II. The employment sought and accepted by Estes being a dangerous one, it was his duty to at least exercise reasonable and ordinary care to avoid injury. If the employment is a hazardous service, he is required to use very great precautions to avoid danger. If, in the discharge of a dangerous duty, an employé voluntarily places himself in a dangerous position, unnecessarily, when there are other places that are safe, or safer, that he could have chosen, and is injured, he cannot recover. These propositions seem to be firmly established as the law governing such cases; and it must be held in this case, both on the evidence and the findings of the jury, that the employment sought by Estes was dangerous; that in its discharge he was required to exercise reasonable and ordinary care to avoid injury; that if, in the discharge of the duty, he voluntarily placed himself in a dangerous position, unnecessarily, when

there were other places that he could have chosen that were safe, or safer than the one chosen, and injury occurred by reason of his choice, he cannot recover.

The jury found in answer to special interrogatories that at the time of the injury there were on the front end of the engine, and the rear end of the tender, foot-boards from eight to twelve inches wide, extending across the entire ends of the engine and tender, and from six to eight inches above the rail; that there were hand-rails on the front end of the engine, and at the rear end of the tender; that these hand-rails and foot-rails were for the use of the employés in riding; that the foot-board at the rear end of the tender was the safest place for Estes to get upon the engine when in motion; that the foot-boards and hand-rails on the front end of the engine and rear end of the tender were in such a position that a person could get upon said foot-boards without getting between the rails. Estes stated, when on the witness stand, that he had adopted the plan of getting on the side, and riding on the side; that he thought it was the safest place. This declaration shows that he had deliberated upon the question, and determined in his own mind that the side step was the safest. The jury found that at the time the injury occurred the rear step was the safest; and the great weight of the testimony is in that direction. So that it was a deliberate choice that he made on that occasion, of the manner of getting on the moving engine, and in this choice he was evidently mistaken.

Another consideration must not be lost sight of in this connection. Estes stated that he did not attempt to get on the foot-board in front of the engine, because he did not consider it safe, as it was coming too fast. It was moving at the rate of about three miles per hour. This shows that he was considering the safest way to get on the engine, and that he had determined on the side step. This brings him within the rule of having voluntarily placed himself unnecessarily in a place of danger, when there was another place that was safer than the one chosen. But there is still another and better view to be taken of this transaction. If it be a fact that as the engine

was moving toward him it was unsafe to attempt to get on in front, the danger was greatly increased by the escapement of steam from the cylinder-cocks against and upon him that created a dust, and the steam and dust so obscured the sight of the step that it was not plainly to be seen, and this rendered an attempt to get on a side step extremely hazardous. The jury found that the distance from the cylinder-cocks to the step where the injury occurred was about twenty feet; that as the engine was passing Estes, the hostler caused steam to be emitted from the cylinder-cocks against and upon the defendant in error, and that the steam and the dust blown up thereby somewhat obscured the step. It must have somewhat obscured the vision of Estes. Under these circumstances it was not ordinary or reasonable care on the part of Estes to attempt to get upon the side step of the engine.

III. The condition of the steps attempted to be used by Estes at the time the injury occurred, is the subject of much controversy both by witnesses and counsel. The plaintiff in error contends that the step at the rear of the cab on the right-hand side of the engine was a flat cast-iron plate, seven inches in diameter, with an iron rod let down from the cab running through a hole in the back of the step and fastened to the rod by an iron set-screw, so that it could be moved up and down and from side to side on the rod, and adjusted to any position desired by the engineer. To support its contention, the plaintiff in error produced a step of this description on the trial, and S. W. Parr, the round-house foreman who had been in charge for six years, identified it as being the step on the engine; that he took it off from the right-hand side of the cab; that it had been there ever since the railway company brought the engine into the yards from the Carbondale road in 1879.

McKensie, who was assistant master mechanic at the time the injury occurred, and who examined the step within a few moments after the occurrence, had no recollection as to the kind of step, but that this was a McKay engine, and they all had a round flat step, corrugated on top so as to make it rough, with no rim around it.

Kirkpatrick, a locomotive engineer who had been running this engine for three months, and who was in charge of it the day before and the day after the injury, said that the step on the right-hand side of the cab was a round step. He was shown the step identified by Parr, and said it was shaped like that, and when asked whether it was the step said that he could not swear that it was the same step, but it was shaped like that.

Dorman, who was the regular fireman on the engine, stated that the step at the place indicated was a round step, and on being shown the round step, said, "I think that is the step, or one just like it."

Kemp, the hostler, said that the step was a round step; was shown several of different pattern, and was asked to take up one like it. He picked up the round step and said, "This is like it." He was then asked whether or not this was the identical step, and said: "I think it is; I won't be positive, but I think that is the same step." He stated, in answer to a question, that the round step is in all respects like the one that was on the cab.

The defendant in error claimed, and the jury found, that the step on the rear of the right-hand side of the cab of the engine was an adjustable scoop-shovel step, with a set-screw; and he supported this by two witnesses.

Steading, who was a hostler, said he examined the step within an hour after the injury, and that it was a scoop-shovel step with a rim around it. If a person looked at it at all, he could see that it was out of line, whether the engine was in motion or standing still. Dickson, who worked at the round-house wiping engines, had seen the step, and being shown a casting, he said it was not like it; fairly described it as a scoop-shovel step.

While it is not very material in the view we take of the duty and obligation of Estes, whether the step was such as claimed by the plaintiff in error, or as found by the jury, it must be conceded that on this particular question the great weight of the evidence was with the plaintiff in error, both on

account of the number of witnesses and their opportunities for knowledge.

About the same proposition is observed in the question as to whether the step was bent so as to make it unsafe. It was claimed by the defendant in error that the rod supporting the step was bent, so that the step was thrown under the body of the cab, or tank; and it having been adjusted at an angle, the opening for the foot, the place where was no rim, was so far back under the frame of the cab that it could not be stepped upon. It was asserted, on the other hand, that if the rod was bent at all, it was but very slightly, and insufficient to impair the use, or render it unsafe; that it was adjusted straight from the engine, and not at an angle. The engineer, who daily handled the engine, and his fireman, being the persons who used the step more than anyone else, and for whose convenience it was adjusted, Mr. Parr, who examined it as a matter of duty, to see if it needed repair, and others, testified to its safe condition, thus giving the plaintiff in error the weight of evidence on this proposition.

It is established, we think, beyond question, by the evidence, that the side step — the one at the rear right-hand side of the cab — and the other, at the front end of the side of the tender, were for the use and convenience of those who had duties to perform in the cab of the engine. There were tools on the engine to so adjust them as to suit the length of the step of the engineer in charge. It is equally clear, that at the time Estes was injured he had no duty to perform that required him to use the steps, or either of them. He was allowed, or he might have been required, to ride from place to place in the performance of his sole duty to throw switches, but there is nothing in the nature or demands of such work to require him to attempt to get upon the cab of the engine.

IV. Estes did not use ordinary and reasonable care to avoid injury. He was engaged in the performance of a dangerous duty, with a constant obligation resting upon him to exercise that degree of caution and care which was necessary to prevent injury. He attempted to get upon the engine when it

was in motion; he had adopted the plan of getting on the side when the rear was the safer place; he had no acquaintance or familiarity with this particular engine; had noticed it but slightly; knew it had a foot-board in front, but did not know whether it had in rear or not.  As it approached him he did not consider it safe to attempt to get on in front; as the cylinder-cocks came opposite to him they emitted steam in such quantities as to blow up a dust, and this so obscured the side step that he could not plainly see it.  He took hold of the hand-rails on the side of the cab and tender, attempted to place his left foot on the side step at the rear right-hand side of the cab; the foot slipped off, rested on the rail, a wheel of the engine mashed and mangled it so that it was amputated in front of the ankle-joint.

There was a want of ordinary care in attempting to get upon the engine by the cab step when he had no duty to perform that required him to place himself in such a position.  There was a want of ordinary care in attempting to get upon the side step, when he had resolved not to attempt to get upon the front foot-board because the engine was moving too fast. There was a want of ordinary care in attempting to get upon the side step when a safer plan could be selected, one where he could have got on without getting between the rails, as he could have done on the rear foot-board.  There was a want of ordinary care in attempting to get upon the side step when it was so obscured by the steam and dust occasioned by the emission of steam from the cylinder-cocks of the engine that it could not be plainly seen.  There was a want of ordinary care in adopting the plan of getting on the side step when there was a safer place to get upon the engine when in motion. There was a want of ordinary care in attempting to get upon the side step of an engine without any previous knowledge of its condition, or examination of its steps, when it was moving so fast as to create a fear that it was not safe to try the front foot-board.  There was a want of ordinary care in attempting to get upon the moving engine at any place when it was moving so fast that he was afraid to get upon the front foot-board, and

when the escaping steam and the dust blown up thereby ob-
scured the vision.

V. These conclusions are not only fairly deducible from
the evidence, but the strength of the testimony compels us to
adopt them; and we have considered them in the several as-
pects of the case as presented by the demurrer to the evidence
of the defendant in error; on the motion of the plaintiff in
error, for judgment on the findings of the jury, as well as on
the motion of the plaintiff in error for a new trial, on the
ground that the verdict of the jury was not sustained by suf-
ficient evidence.

Now, grouping the facts together as found by the jury in
answer to the special interrogatories, so as to follow the order
of the recitations of the facts stated in the instructions that
would prevent a recovery, we have these findings of the jury:

In answer to question 4, submitted by the plaintiff in error,
they find that Estes had no duty to perform on the engine,
except to ride from place to place where it was necessary to
throw switches.

Finding 31: The engine was provided with foot-boards.
Finding 25: The foot-board on the rear end of the tender
was the safest place for the plaintiff to get upon the engine
when in motion, at the time he was injured. The jury were
instructed that if these facts were found, that the plaintiff could
not recover, and the jury found these identical facts — found
every fact necessary under the instruction to bar recovery on
the part of the plaintiff. They also found the exact facts that
they were told in the sixth instruction would prevent a re-
covery.

Taking instructions 8, 9 and 11 together, and comparing
the findings, and again we see that the jury found the facts
that under the instructions would render the railway company
not liable to the plaintiff in damages. While it is probably
true that these instructions very fairly embodied the law of
this branch of the case, it was the bounden duty of the jury
to obey them, whether the instructions were proper or not.

47 — 37 KAS.

In this class of cases the jury must take the law as the court gives it, and a reasonable obedience to the instructions would have resulted in a verdict for the railway company.

There is an assertion in the brief of the counsel for the defendant in error that is so plausible and yet so fallacious that we must notice it. It is said: " Had he been successful in his attempt to get upon the engine and had reached his place, and then there had been a collision by which he was injured, such collision having occurred through the negligence of the railway company, would he have no remedy? He certainly would have a remedy; and if so, why should he not have his remedy if a step which was used in getting into the cab was so defective and out of order that he was thereby injured? In both instances he is injured by reason of the negligence of the railway company." We answer, if Estes had been successful in getting upon the engine at the proper place, and had then been injured by the negligence of other employés of the railway company, he would have his remedy against the company. They say: " If a step that was used in getting into the cab was so defective and out of order that he was thereby injured, why should he not have his remedy?" We answer, if the step was for his use and convenience in getting in and out of the cab, and he attempted to use it in the performance of some duty, and it was defective, and the company knew it, or had reasonable opportunities of knowing it, and Estes did, or had not, he could recover. But if he had no duty to perform in the cab that required the use and convenience of the step, he could not recover. In the first inquiry, it would be the negligence of the other employés of the company; in the second, it would be the negligence of Estes in attempting to use a step when he had no duty to perform that required its use. While a railroad company may be liable for injuries to a person whose duty it is to use some defective machinery or appliance, it may not be liable to a person who is injured thereby who had no duty to perform in connection with the defective machinery.

Our conclusion in this case is, that the court below ought to have sustained the motion of the plaintiff in error for judg-

ment in its favor on the findings of the jury. It is therefore recommended that it be remanded to the district court, with instructions to render judgment for the railway company on the special findings of the jury.

By the Court: It is so ordered.

All the Justices concurring.