THE RIVERSIDE IRON-WORKS COMPANY V.
GEORGE K. GREEN.
No. 15,701.   (100 Pac. 482.)
SYLLABUS BY THE COURT.

MASTER AND SERVANT—*Injury to Employee—Assumption of Risk.* Where a painter by trade, of mature age, accepts an employment which requires him and many other employees, in going to and from their work, to pass (at an elevation of twenty-five feet) over a gangplank twelve feet long, twelve inches wide and two inches thick, supported at one end by a steel frame and at the other by a concrete abutment to a

Iron-works Co. v. Green.

bridge, and, without complaint, he continues in such employ-
ment ten days and passes over such plank several times each
day, and has full opportunity to see that the plank is entirely
unfastened at either end, *held*, he has as full knowledge of any
danger from such crossing as has his employer, and, by con-
tinuing in the employment, he assumes the risk of danger
therefrom.

Error from Wyandotte district court; J. McCabe
Moore, judge. Opinion filed March 6, 1909. Reversed.

### STATEMENT.

A span of the Kansas City Southern Railroad bridge
crossing the Kansas river was washed from its piers by
the flood of 1903. The Riverside Iron-works Company
was engaged in replacing it. In so doing the company
employed a number of workmen—some iron-workers
and some painters. Green, the plaintiff, was one of the
painters. The painters would climb about the span,
which was of steel, and, as it was elevated above the
water, would scrape off the old paint, and put new
paint on its various parts from day to day. In going to
and fro from the top of one of the piers of the bridge
to the span on which they were working the workmen
used a wooden plank about twelve feet long, twelve
inches wide and two inches thick, so placed that one end
thereof rested upon the pier, which was constructed of
concrete, and the other end rested upon the steel frame-
work of the span. As the span was elevated the end of
the plank resting thereon was lowered from time to time,
so that the incline of the plank was somewhat changed,
and at the time of the accident the end of the plank
upon the pier was three or four feet higher than the
end which rested on the span. Immediately prior to
the accident the plaintiff had been working there and
crossing over this plank several times a day for about
ten days. The plank was about twenty-five feet above
the surface of the river, and the end resting upon the
pier extended upon the pier about a foot and a half or
two feet. It was not fastened at either end, and had

not been, and there was nothing to prevent the plaintiff from seeing this. There were no ropes or guiderails placed along the sides of the plank.

On the day of plaintiff's injury he went across this plank from the span to the top of the pier to eat his noon lunch, and as he was in the act of stepping from the plank to the pier the end of the plank moved or slipped slightly, so that he lost his balance and fell, receiving the injuries complained of.

*William Warner, O. H. Dean, W. D. McLeod,* and *H. C. Timmonds,* for plaintiff in error.

*George R. Allen,* and *J. W. Dana,* for defendant in error.

The opinion of the court was delivered by

Smith, J.: This action was brought against the Riverside Iron-works Company and one Hedrick, the foreman of the company. The negligence complained of was in placing and maintaining the plank to be used as a gangway without permanently fastening it so that it could not move or shift in being so used, and in failing to provide any guard- or hand-rail for the protection of workmen in crossing the gangplank. The defense was a general denial, assumption of risk, and negligence of coemployees. The reply was a general denial.

At the close of the plaintiff's evidence the company and the foreman separately demurred to the sufficiency thereof. The court sustained the demurrer as to the foreman, and overruled it as to the company. The company stood upon its demurrer and offered no evidence. The verdict and judgment were against the company, for $600.

Much of the brief of plaintiff in error is devoted to the discussion of its contention that, as it was charged with negligence only through its foreman, Hedrick, a judgment in favor of the foreman debars any recovery from his principal. Where the negligent act which

causes the injury is done in violation of the orders of the master, as in *Doremus v. Root,* 23 Wash. 710, 63 Pac. 572, 54 L. R. A. 649, the master's liability in damages arises only from the doctrine of *respondeat superior.* Where, on the other hand, an employee is injured through some omission to provide for the safety of employees, as to furnish safe appliances for their work or a safe place to work, the master may be liable independently of an act or omission of his foreman. (See *Emporia v. Kowalski,* 66 Kan. 64, 71 Pac. 232.) It is sufficient in this case to say that the evidence does not disclose a state of facts which hinges the liability of the master upon the doctrine of *respondeat superior.*

We pass then to the only other question which we deem necessary to consider, viz., Did the plaintiff assume the risks incident to using the gangplank in question? He was a man about twenty-four years of age, a painter by trade, as he said a "construction painter," which would indicate that he was accustomed to working and walking upon scaffoldings and the like at exposed elevations. He had worked upon this bridge span for ten days, and had passed up and down this gangplank more than two times a day. The gangplank, one end of which rested upon some part of the steelwork and the other end upon a concrete pier of the bridge, was fully exposed to the view of any person passing over it, and was so simple a device for the purpose for which it was used and so easily comprehended that it seems that any workman of the plaintiff's experience must have at once comprehended any danger that might arise from passing over it. In regard to the situation the plaintiff testified as follows:

"Ques. And the slope or slant of the board was about the same the day you were injured that it was prior to that? Ans. Well, something like that, as near as I can remember.

"Q. You knew that the top of this board rested upon the concrete pier, did n't you? A. Yes, I knew it was on the pier.

"Q. And you also knew, did you not, that the top of that board could not be nailed, to the concrete pier, did n't you? ·A. Well, I did n't know how it was fastened, there was not anything to—

"Q. Did n't you know it was n't nailed into the concrete pier; did you not know that nails were not driven through the board and into the concrete? A. Well, I did n't know how they had it fastened, as far as that, there was never anything to call my attention to it, I did not pay any attention.

"Q. Did you know whether or not the bottom of that board was nailed into the iron chord? A. No, sir; I did n't know.

"Q. You did not know whether there were or were not nails driven through this board and into the concrete pier at the top, did you? A. No, sir.

"Q. You had, for ten days, gone up and down that board at least four times, and never at any time paid any attention as to how it was fastened—whether it was nailed, or whether it was n't, had you? A. No, there was n't anything to call my attention; all of the fellows·were using—

"Q. There was nothing to prevent you seeing the condition of the board, was there? It was perfectly light, was n't it? A. Yes, sir; it was light.

"Q. There was no building or covering over this place, was there? A. No, sir.

"Q. It was all out in open sight, was n't it? A. Yes.

"Q. All the conditions were there, were n't they? A. Yes, sir.

"Q. Mr. Green, during all the time that you were working there, going up and down this board, there was not anything, was there, to prevent your seeing the exact condition of the board, whether it was nailed or otherwise fastened or not? Please answer yes or no. These gentlemen want the facts. What is the fact, was there anything to prevent it? Please answer my question yes or no, please. Tell us the facts. Please read him the question. (Last question read by stenographer.) Q. Was there anything to prevent it? A. Well, no, only—

"Q. That is all, thank you, unless you want to make some explanation. If you want to make some explanation of your answer I don't want to take advantage of you. A. I started to say, if there had been anything to call my attention to it, in a general way."

And further he said:

"Ques. The board was in the same condition it had been all the other times you had gone up there, was it, so far as you knew? Ans. So far as I knew, I thought it was.

"Q. Each of the other times you had gone up there, did you go up in the same way you did this time? A. Yes, sir.

"Q. Just exactly? A. Yes.

"Q. Stepped onto the pier in the same manner you did this time? A. Yes, sir; we always had to walk up here and go around on the pier the same way.

"Q. You went up this time in the same way you always had before? A. Yes.

"Q. And the board was in the same condition so far as you know that it was all the times you had gone down over it before? A. Well, I thought it was."

From this it appears that the plaintiff must have known as much as the employer or its foreman or any one else could have known as to any possible dangers incident to using the gangplank as a passageway. If he had full means of knowing the danger, and, without making any complaint, continued in the employment which required him to pass over this gangplank, he must, under the numerous decisions of this court, be held to have assumed the risk of danger involved therein. In *Rush, Adm'x, v. Mo. Pac. Rly. Co.,* 36 Kan. 129, 12 Pac. 582, it was said in the syllabus:

"But where a railway is so constructed [referring to the omission to place blocking between the main rails of its tracks and the guard-rails] and a competent railroad man is employed to work in one of the company's yards as a yard switchman and in such yard there are many switches and about twenty guard-rails, and the employee voluntarily and without complaint does switching in such yard every day for about two and one-half months, when he steps between the main rail and the guard-rail of one of the company's railway tracks, and because thereof receives injury, *held,* that the condition of the railway tracks and the danger must have been known to the employee, and therefore that he assumed the risk; that he waived any negligence

38—79 KAN.

that might otherwise be imputable to the railway company; that as between the railway company and himself the railway company can not be charged with culpable negligence, for the reason that one party can not be guilty of culpable negligence as toward another party unless the first party is guilty of some breach of duty as toward the other party; and that all these questions as presented in this case are questions of law for the court, and not questions of fact for the jury."

(See, also, *A. T. & S. F. Rld. Co. v. Schroeder,* 47 Kan. 315, 27 Pac. 965; *Morbach v. Mining Co.,* 53 Kan. 731, 37 Pac. 122; *Clark v. Mo. Pac. Rly. Co.,* 48 Kan. 654, 29 Pac. 1138; *S. K. Rly. Co. v. Moore,* 49 Kan. 616, 31 Pac. 138; *Railway Co. v. Loosely,* 76 Kan. 103, 90 Pac. 990; *Railway Co. v. Stone,* 77 Kan. 642, 95 Pac. 1049.)

In the Morbach case, *supra,* it was said:

"Where the employer and the employee are equally competent to judge of the risks and hazards, and both have equal knowledge of the surroundings, the employer can not be culpably negligent to the employee, although the work may be dangerous and hazardous, and although it might be made safer by the employer if he should choose to do so." (Syllabus.)

There is danger in every step of life, and no employment can be entirely freed therefrom. It is the duty of employers of men to furnish their employees a reasonably safe place to work, and if the knowledge comes to any employee that his labor exposes him to any unnecessary danger it is the duty of the employee either to quit the employment or to make complaint to his employer. If he does not quit the employment, or if he continues therein for an unreasonable time after his complaint is unheeded, he is held to have assumed the risk of danger from his employment. At the first glance this seems to be a harsh rule, but since men have the right to accept employment in which both parties know the employee will be exposed to danger, and the employee has a right to accept greater compensation

by reason thereof, neither the courts nor legal writers have been able to evolve a more equitable rule.

We think from the plaintiff's own evidence, which was practically the only evidence in the case on this subject, he should be held, as a proposition of law, to have assumed the risk of danger in ascending and descending the gangplank. Indeed, the danger does not seem to have been imminent, as it appears by the uncontradicted evidence of another witness that the other workmen continued to use the gangplank in the same way without any fastening after this accident occurred.

The judgment is reversed and the case is remanded.